IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 7, 2006

**STATE OF TENNESSEE v. KASCEY MARQUIS CAMPBELL**

**Appeal as of Right from the Criminal Court for Shelby County**
**No. 03-06888   W. Otis Higgs, Judge**

---

**No. W2005-02810-CCA-R3-CD - Filed March 23, 2007**

---

A Shelby County jury convicted the Defendant, Kascey Marquis Campbell, of first degree premeditated murder, two counts felony murder, robbery, and aggravated burglary. On appeal, he contends that there was insufficient evidence to support his convictions and that he acted under duress. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and JAMES CURWOOD WITT, JR., JJ., joined.

Phyllis Aluko and Robert Jones (on appeal), and Kathy Kent and Latonya Burrow (at trial), Memphis, Tennessee, for the Appellant, Kascey Marquis Campbell.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; Thomas Hoover and Steve Crossnoe, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the murder of Joe Ellen Henry. At the Defendant's trial for this murder, the following evidence was presented: Susan Henry testified that Joe Ellen Henry was her mother, and she last saw her alive on July 12, 2003. The next day, she went to her mother's house and saw that her mother's car, a 2001 white Mercury Grand Marquis, was gone. She used a spare key to unlock the door and enter her mother's home, where she saw her mother lying across the foot of her bed. She put her hand on her mother's leg and rocked her. She realized her mother was dead and noticed she had a blouse wrapped around her head and a black strap wrapped around her neck.

Henry went to the kitchen, called 9-1-1, and the police came to her mother's residence. She saw her mother's purse on the floor and realized that one of the credit cards was missing. Later, she

received a credit card bill for $109 that was charged after the victim's death. About two weeks after the victim's death, Henry picked up her mother's car from an impound lot, and the personnel gave her a set of keys that did not belong to her mother. She noted that the keys had a VISA card attached to them bearing the Defendant's photograph.

Officer Lavern Jones testified that she investigated the crime scene for this case and that she collected a clock and some broken glass from the crime scene. Francis Donald Carpenter described how he retrieved fingerprints from items collected from the crime scene. Officer Morton Milner testified that he examined the fingerprints that were collected from the crime scene and discovered that they belonged to the Defendant. Officer David Galloway described how he investigated the victim's home and made diagrams of the rooms in her home.

Catherine Sears, the victim's neighbor, testified that she saw the victim's car leave the victim's driveway on Saturday evening, July 12, 2003, between 10:00 and 10:30 p.m. She was unable to identify he driver of the car but could tell the driver had dark hair. Sears testified that the driver drove in a different direction from the route that the victim usually took.

Sergeant T.J. Helldorfer testified that he oversaw the investigation. He described how he received and organized all of the information regarding the case. He testified that he learned the location of the victim's vehicle, and officers went to that location and arrested three people one of whom was the Defendant. The Defendant provided officers with a statement.

Officer Robert Hence testified that he performed a surveillance operation and was on the lookout for a White Mercury Grand Marquis. He saw this car and radioed other officers who then came to the scene and placed the occupants of the vehicle under arrest. Officer Hence testified that the Defendant was driving the car.

Lawrence James, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that he performed a DNA analysis of blood from a clock that was obtained from the crime scene. He found DNA samples on the clock that matched the victim's DNA and the Defendant's DNA. Teresa Allen Campbell, a pathologist, described how she performed an autopsy on the victim. She testified that, when she first saw the victim, the victim had clothes pulled up around her neck and a strap around her neck. Campbell explained that the victim had neck injuries that indicated that she had been strangled to death. On cross-examination, Campbell acknowledged that she could not determine who killed the victim.

Lieutenant Nathan Berryman testified that he investigated the victim's home and found a clock and shards of broken glass. He also testified that he was present at the scene when the Defendant was arrested. Lieutenant Berryman interviewed the Defendant and obtained the following statement.

Saturday morning my little brother was outside the house on Windy Drive with his little friends. I went outside and told him to come in the house because it

was too early for him to be outside. His little buddies cursed me out or whatever. Finally, he came in the house.

When he came in the house, I told him not to mess with them guys. Later that evening my little brother was on the phone talking to this guy that I got into it with. I told him to give the phone to me, and I took the phone from him.

That is when I talked to the dude, and I told him that we were moving back to South Memphis in a couple of weeks. So me and him got into it over the phone. We started cussing each other out.

From there I asked him to leave my little brother alone. From there he told me to call him back later on that day. He called us back at about 7:30 p.m. We were on the phone talking. He was like meet me at the house on the corner where the lady drives the brown Marquis.

When it got dark, I went to the house. I was coming down Windy, and he was coming down Trudy. I walked down the driveway, and he cut across the back of the yard where the tree was, and we went in the backyard.

I asked him what we were about to do. He said we were waiting for this old lady to come home and we were going to rob her. I was like okay that is cool. Let's go ahead and get it over with.

We were standing there for about an hour in the back of the house, and I got tired of standing. Then I said I was going back to the house. Then he said, "No, the . . . you ain't"

So I said let's sit down. He told me not [to] sit in the grass because he didn't want [to] mess his clothes up. Then we went and pulled up a wagon wheel that was stuck inside the ground and laid it down behind the house on the right hand side of the gate.

We sat there for about an hour. Then finally we saw the lights pull up in the driveway. So we peeked around the corner and saw that she was going to the mailbox. When she had her back turned, he ran around to the other side of the house where the garbage can is.

Finally, when she got up to the [d]oor, that is when he came from [b]ehind. When he opened the door and he got her into the house, that is when I came up from behind him. He had the keys to the car in his hand, and then he put them in his pocket.

She said that she didn't have any money and to take whatever you want, whatever you-all want and leave. He shoved her down on the ground on her stomach face towards the door, and she was saying that her back was hurting.

He was holding her down. He told me to hold her down, and he got off of her so she wouldn't move. He went and looked around. While I was holding her down, she was telling me that her back was hurting. I kept on telling her to be still that I wasn't going to hurt her.

When he came back to the front, he said that he couldn't find anything. I was like that is cool. Let's go. He was like, no, she probably saw us. I said that I was about to go. Then he pulled the gun out. He said that I wasn't going nowhere until he finished what he had to do.

Then over by the pole lamp he pulled out a shirt. I put it over her head and covered her eyes up. Then I said now what? He said let's go to the back. I helped her up, and we went to the back room. There was a bed with a whole lot of junk on it.

So he told her to get up on the bed. She couldn't get up on the bed so I helped her up on the bed. That is when he moved me out of the way. Then he started squeezing the shirt real tight where she couldn't breath [sic].

That wasn't working at all. Then he told me to get up on top and hold her down. I grabbed the shirt and started holding it like he was holding it. The shirt was already twisted, and I was holding the twisted end . . . .

She must have kicked and he grabbed the clock and hit her in the head three or four times with it. I knocked the clock out of his hand on the floor on the far side of the bed by the window. He got mad at me for knocking the clock out.

I told him that I was about to go. Then he was like, no, you are about to finish this for me. Then he pulled out a black strap he took off of one of the bags on the bed. I was still holding the shirt. I slid my arms up a little bit still holding the shirt and put the black strap up under her neck.

We switched and I grabbed the strap and he grabbed the shirt and she was still throwing her arms back and forth. He was squeezing his and I was squeezing mine until she finally stop[sic] breathing. After about three minutes she was gone.

Then we got up and walked through the kitchen, and I cut the lights off. We then went to walk out the door, and I locked the wood door behind me. He drove to the Tiger Market on Jackson, and I road [sic] in the passenger seat.

I went to the Tiger Market but my ATM card wouldn't work. I go[sic] back to the car, and he was mad because I couldn't get anything. I told him I was ready to go home then . . . .

I dropped him of at his girlfriend's house at Bellvue McLemore. When we got there we sat there and talked for a minute. I asked him what did he want me to do with the car. I said that I was about to go dump the car.

He told me not to because he wanted to chop it up or something. Then I said how long do you want me to keep it. He said don't worry about that. I will call you when I want to.

So he got out of the driver's seat and I got into the driver's seat and pulled off. I went to the house on Windy and got a change of clothes. I had went over to my friend's house, Latisha, and washed my clothes. Then I laid on the couch and went to sleep.

When I woke up and I put on my work clothes on and went to work like it was a regular day. I had to be at works [sic] at about 11:00 a.m., but I left about 8:00 a.m. I worked until about 4:00 p.m. After I left work, I don't remember what I did on Sunday.

Lieutenant Berryman testified that he could not find any information regarding the other individual that the Defendant described in his statement. On cross-examination, he acknowledged that the Defendant threw up when officers began to question him.

Based upon this evidence, the jury convicted the Defendant of first degree premeditated murder, two counts of felony murder, robbery, and aggravated burglary.

## II. Analysis

On appeal, the Defendant asserts that there was insufficient evidence to support his convictions and he acted under duress. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see Tenn. R. App. P. 13(e); State v. Goodwin, 143 S.W.3d 771, 775 (Tenn. 2004) (citing State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this

Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); Liakas, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. Goodwin, 143 S.W.3d at 775 (citing State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000).

### A. First Degree Murder

First degree murder includes a "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). Premeditation is defined as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (1997).

Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done "after the exercise of reflection and judgment" as required by Tennessee Code Annotated section 39-13-202(d). State v. Leach, 148 S.W.3d 42, 53 (Tenn. 2004) (citing Davidson, 121 S.W.3d at 615). The element of premeditation is a question for the jury and

may be established by proof of the circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). The Tennessee Supreme Court previously has identified the following circumstances as supporting a finding of premeditation: the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness after a killing. See Id. (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn.1997)). However, these factors are not exhaustive. Davidson, 121 S.W.3d at 615. Establishment of a motive for the killing is a factor from which the jury may infer premeditation. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998). This Court has previously held that a defendant who lay in wait for a victim to return demonstrated the capacity for premeditation. State v. Mabel J. Longmire, No. 1999-00260CCA-R3-CD, 2001 WL 128561, at *5 (Tenn. Crim. App., at Jackson, Feb. 15, 2001), *perm. app. denied* (Tenn. June 4, 2001).

Viewed in a light most favorable to the State, the evidence is sufficient to sustain the Defendant's conviction for first degree murder. The proof at trial showed that the Defendant laid in wait for over an hour for the victim to return home. When the victim arrived and unlocked the door to her house, the Defendant pushed her inside, knocked her down, and drug her to her bedroom where he strangled her with her blouse and with a cord from one of her bags. Although the Defendant argues that the evidence of premeditation is not strong, this Court does not re-weigh or re-evaluate the evidence on appeal. As noted above, the weight and value to be given to the evidence, and the credibility to be given to witnesses is left to the jury. Liakas, 286 S.W.2d at 859. Therefore, the Defendant is not entitled to relief on this issue.

### B. Robbery

Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2003). "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103 (2003). We conclude that, considering the evidence in the light most favorable to the State, the evidence is sufficient to support the Defendant's robbery conviction. The record reflects that the Defendant stole the victim's credit card and car after attacking her in a violent manner. The Defendant is not entitled to relief on this issue.

### C. Aggravated Burglary

Aggravated burglary occurs when, without the effective consent of the property owner, a person enters a habitation with intent to commit a felony, theft, or assault. Tenn. Code Ann. § 39-14-403 (2003). We conclude that, considering the evidence in the light most favorable to the State, it is sufficient to support the Defendant's aggravated burglary conviction. The proof at trial showed that the Defendant forcibly entered the victim's home, which is a habitation, after surprising her from behind as she attempted to enter her home. Once inside, he committed multiple felonies, including

murder and robbery. This evidence is sufficient to support the Defendant's conviction for aggravated burglary.

## B. First Degree Felony Murder

The Defendant was convicted of two counts of the first degree felony murder of the victim. First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnaping, aggravated child abuse, aggravated child neglect or aircraft piracy . . . ." Tenn. Code Ann. § 39-13-202(a)(2) (2003). "No culpable mental state is required for conviction under subdivision (a)(2) . . . except the intent to commit the enumerated offenses or acts in such subdivisions." Tenn. Code Ann. § 39-13-202(b).

We previously concluded that the evidence is sufficient to sustain the Defendant's convictions for robbery and aggravated burglary. The Defendant not only forced himself into the victim's home to rob her, he also beat her and strangled her. The victim's killing was committed during the Defendant's perpetration of a "robbery, [and] . . . burglary . . . ." See Tenn. Code Ann. § 39-13-202(a)(2). Therefore, we hold that the evidence is sufficient to sustain the Defendant's convictions for the first degree felony murder.[1]

## E. Duress

The Defendant contends that he acted under duress and argues that the defense of duress prevents a conviction of all the charged offenses.

> Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-504(a) (2003). The Sentencing Commission Comments to this section advise that the duress defense requires that the offense must be committed because another person threatens death or serious bodily injury if the offense is not committed. Id. Sentencing Comm'n Cmts. There must be no reasonable means to escape the compulsion to commit the offense. See State v. Robinson, 622 S.W.2d 62, 73 (Tenn. Crim. App. 1980).

---

[1]We note that the two felony-murder convictions were merged with the conviction for first degree premeditated murder.

The Defendant claims that he believed that he and his family would have been hurt had he not complied with another's orders. The evidence presented, however, demonstrates the lack of a present, imminent, impending, and continuous threat of harm. At best, the jury was presented a generalized apprehension that the Defendant or the Defendant's family might have been hurt somehow, at some unknown point in the future. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE